NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

YUSEF ALLEN,                  :

                         :       Civil Action No. 13-4304(KM)

            Petitioner,    :

                         :

    v.                      :        **OPINION**

                         :

CHARLES WARREN, *et al.*,    :

                         :

           Respondents.  :

KEVIN McNULTY, District Judge

## I. INTRODUCTION

This matter comes before the Court upon the Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (Dkt. No. 1) filed by Yusef Allen ("Allen"), an inmate confined in East Jersey State Prison in Trenton, New Jersey. Respondents filed an Answer and brief opposing habeas relief. (Dkt. No. 37). Allen filed a Reply to Respondents' Answer (Dkt. No. 40.))

## II.     FACTUAL AND PROCEDURAL BACKGROUND

*A.    Summary of Evidence at Trial*

The evidence was summarized by the New Jersey Superior Court, Appellate Division, on Allen's direct appeal, *State v. Allen*, 337 N.J. Super. 259, 263, 766 A.2d 1168 (App. Div. 2001) ("*Allen I*"), as follows:[1]

> On October 15, 1997 at around 6:00 a.m., Ruby Waller was approached by Lannie Silver near West Third Street and Lee Place in Plainfield. Silver was looking for a location to buy drugs and was escorted by Waller to the Mack House on Prescott Place where she regularly purchased crack-cocaine.

---

[1] The facts found by the Appellate Division are presumed correct. *See* 28 U.S.C. § 2254(e)(1).

Upon arriving at the "Mack House," Waller proceeded to the window at the front of the house and sat on a bench located in front of the window. The window shade was drawn. However, Waller placed an order for "four nickels" of crack-cocaine and slid $20 through the "cracked" portion of the window to a man she identified as "Ben." [FN 2] After receiving the drugs that she purchased, Waller stood and moved away from the window, allowing Silver to sit on the bench.

> [FN 2] Although she could not see his face, Waller testified that she could identify the voice of Ben McNeil, her "little cousin's father."

Silver then asked Ben, "[w]hat you got," at which point Ben "pulled the shade back and looked out the window" at Silver. After seeing Silver, Ben and defendant exited the house, and Ben yelled at Silver, "get the F out of here, [we] don't see drugs [here], what mother-f......" [FN 3, regarding jury selection, omitted] Silver tried to retreat from the porch with his hands in the air, repeating that he "just want[ed] to buy some drugs. However, defendant and Ben followed Silver, yelling at him and using profane language. According to Waller, at one point defendant stated, "[h]old up, I got something for this mother-f......" He then entered the Mack House and returned "a second" later holding a gun "in his hand, down on the side."

Upon seeing the defendant with a gun, Waller testified that she "ran" to her residence a short distance away. As she "approached the stop stairs" to the house, Waller heard a gunshot. Once inside the house she heard "several more" shots and "hear[d]" the victim screaming."

After entering her apartment, Waller testified that she looked out a window from which she could view the intersection of West Third Street and Prescott Place. She saw Silver "trying to run" but fall to the ground after "the last shot hit him." Waller further testified that Silver tried to get up but could not and finally "crawled to the middle [of Prescott Place]" before collapsing. Waller indicated that the time between the first and last shots was "like a half second."

After witnessing the victim laying in the middle of the street, Waller saw Ben and defendant "running into the Mack office" located close to the house where she had purchased drugs earlier that morning. Waller immediately phoned 911 and reported the incident to the police.

Rhonda Whitfield, who was serving a sentence in the Middlesex Correctional Facility during trial, testified that she was "[g]oing to buy a bag," that morning and saw the victim "on the porch" of the Mack House, "[l]ike talking to the screen." Only one person is permitted on the porch of the Mack House at a time, so Whitfield stayed on the street. As the victim was talking, defendant and "Marvin" came out of the house. Whitfield was "dope sick" and paying "no mind," but "knew something wasn't right." She started to leave the area to buy drugs elsewhere when the defendant and Marvin began "yelling" at the victim,

who was "trying to walk" away. As the victim walked away, defendant was "running behind the guy," holding an object to his side. Whitfield subsequently heard what she thought were "fire-crackers."

Whitfield further testified to having been in an automobile accident subsequent to the date of the shooting and that she had experienced some memory loss due to "head trauma" suffered in the accident. [FN 4]

> [FN 4] Defendant argued that he was "incredulous[ly]" not informed of the accident and related memory loss until that fact was brought out during cross-examination at trial. The prosecutor stated that he was told Whitfield had "hurt her head" but "was not aware of any type of failure to remember the incident." To support its position, an investigator testified before the judge, outside the presence of the jury and at the end of the trial, he interviewed Whitfield with the Assistant Prosecutor at the Middlesex County Jail four days before trial, and "[s]he mentioned that she banged her head." According to the investigator's testimony, Whitfield said nothing about a "memory loss," a related hospitalization, or "being unable to remember the incidents."

Bobby Harris, a high school student, testified on defendant's behalf that, while he was walking his dog on the morning in question, he heard shots and saw that "dude about to fall." He turned around, ran home, but saw a white car "ride pas[t]." [FN 5] The car drove past Harris about fifteen to twenty minutes later, but he did not look inside when an occupant yelled to him.

> [FN 5] Waller also saw a van at the scene. However, she described the van as being blue and testified that it swerved to avoid hitting the victim as he lay in the street.

Cynthia Harrison testified for defendant at she saw the victim with a male named John Korman minutes prior to the shooting. Silver asked her "where to find cocaine," and she gave them directions to "the corner of Prescott."

*Allen I*, 766 A.2d at 1170-71.

B.     *Conviction and Direct Appeal*

On or about May 29, 1999, a jury in New Jersey Superior Court, Union County, found Allen guilty of three counts of the indictment: (Count 1) murder, N.J.S.A. 2C:11–3a(1) and/or (2); (Count 2) possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39–4a; and (Count 3) possession of a firearm without a permit, N.J.S.A. 2C:39–5b. (Dkt. No. 1 at ¶¶2, 5); *State v. Allen*, 337 N.J. Super. 259, 263 (App. Div. 2001) ("*Allen I*"). On the murder charge, Allen was sentenced to a term of life imprisonment, with 85% of seventy-five years to be served without parole eligibility under the No Early Release Act (NERA). *Allen I*, 337 N.J. Super. at 263. He was sentenced to a concurrent five-year sentence for the permit violation. *Id.*

Allen appealed his conviction and sentence. The Appellate Division, on February 14, 2001, affirmed on the trial issues raised by defendant, vacated the NERA term imposed on the life sentence, and remanded for imposition of a sentence of life imprisonment with thirty years' parole ineligibility. *Id.* at 264. The New Jersey Supreme Court denied certification. 171 N.J. 43 (Jan. 24, 2002).

C.     *First PCR Ruling and Appeal (Allen II)*

Allen filed a petition for post-conviction relief (PCR) on February 20, 2002. (Dkt. No. 1, ¶11.) The PCR Court (Judge Triarsi, who had presided at trial) denied that petition on September 20, 2005. (Dkt. No. 37-54.) On March 4, 2008, the Appellate Division affirmed the PCR Court as to most of Allen's claims. *State v. Allen*, 398 N.J. Super. 247 (N.J. Super. Ct. App. Div. 2008) ("*Allen II*"). As to two of Allen's claims, however, the Appellate Division remanded for an evidentiary hearing (1) as to whether counsel had been ineffective in deciding to reject the trial judge's offer of a mistrial; and (2) to determine whether an affidavit from John Korman constituted newly discovered exculpatory evidence that would warrant a new trial.

D.     *Second PCR Ruling and Appeal (Allen III)*

On remand, the PCR Court, again Judge Triarsi, held an evidentiary hearing to deal with the two issues as to which the Appellate Division had required further findings.

The first involved Rhonda Whitfield's alleged memory loss. On the second day of trial, the trial judge ruled that the prosecutor had violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to inform the defense before trial that Whitfield, a prosecution witness, had suffered head trauma in a car accident and that those concussions had affected her memory. The trial judge offered a mistrial, which he thought Allen might decline for economic reasons, so he suggested that counsel confer with Allen. After conferring for fifteen to twenty minutes, defense counsel declined the mistrial, stating economics had nothing to do with the decision. Defendant Allen personally confirmed his decision to decline a mistrial on the record. After another complaint about the prosecutor's conduct, the trial judge again offered a mistrial and directed defense counsel to confer with Allen. After a recess, defense counsel again declined a mistrial.

The second issue involved an alleged exculpatory witness, John Korman. On the third day of trial, Korman was escorted into the courtroom so defense witness Cynthia Harrison could identify him as the person she saw with the victim on the day of the shooting.  Allen submitted to the PCR Court an affidavit in which Korman stated that he witnessed the victim's shooting, and that Allen was not the person who shot the victim. Korman's affidavit stated that he had been unwilling to testify earlier because he did not want to get involved. He was also afraid to come forward because, a few days after the shooting, he told the police he was not there the night Silver was shot, and was reluctant to contradict himself. He felt guilty, he said, and he was now willing to testify.

After an evidentiary hearing and fact finding, Judge Triarsi denied Allen's claim that counsel had declined a mistrial for economic, rather than strategic, reasons and had therefore been ineffective. The judge found factually that defense counsel had declined a mistrial for sound strategic reasons. Judge Triarsi also found Korman's testimony incredible, and concluded that he had fabricated his affidavit. Finally, the PCR Court also held that Korman's affidavit did not meet the standard for newly discovered evidence. (Dkt. No. 37-18; Dkt. Nos. 37-56 through 37-64.)

Allen again appealed. *State v. Allen*, 2011 WL 677252 (N.J. Super. Ct. App. Div. Feb. 28, 2011) ("*Allen III*"). The Appellate Division affirmed as to the Whitfield and Korman issues.

While the *Allen III* appeal was pending, however, Allen submitted a *pro se* motion, contending that a key prosecution witness, Ruby Waller, had contradicted her trial testimony when testifying in a related federal case, *United States v. Mack. Id.* at *10. *See* 00-323 (D.N.J.) *Allen III* remanded that issue to the PCR judge for consideration as a motion for a new trial based on newly discovered evidence.

E.    *Third PCR Ruling and Appeal (Allen IV)*

On remand, the PCR Court again denied relief. (Dkt. No. 37-65). The judge analyzed Waller's testimony at the two trials, supplementing his recollection with his notes of trial. He also concluded that any inconsistencies did not meet the test for newly-discovered evidence. Allen, who was counseled, could have with reasonable diligence discovered the transcript of the *Mack* trial and brought it to the court's attention some ten years previously.

Allen appealed again. *State v. Allen*, 2012 WL 1836109 (N.J. Super. Ct. App. Div. May 22, 2012) ("*Allen IV*"). The Appellate Division affirmed. *Id.* The New Jersey Supreme Court denied certification, 213 N.J. 567 (Jan. 16, 2013).

Allen filed his habeas petition in this Court on July 15, 2013. (Dkt. No. 1) His petition

raised nineteen grounds for relief, discussed below.

### III.   HABEAS CORPUS-LEGAL STANDARD

28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim--
>
>> (1) resulted in a decision that was contrary to, or involved
>> an unreasonable application of, clearly established Federal
>> law, as determined by the Supreme Court of the United
>> States; or
>>
>> (2) resulted in a decision that was based on an unreasonable
>> determination of the facts in light of the evidence presented
>> in the State court proceeding.

"Contrary to clearly established Federal law" means the state court applied a rule that

contradicted the governing law set forth in U.S. Supreme Court precedent or that the state court

confronted a set of facts that were materially indistinguishable from U.S. Supreme Court

precedent and arrived at a different result than the Supreme Court. Eley v. Erickson, 712 F.3d

837, 846 (3d Cir. 2013) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). The phrase

"clearly established Federal law" "refers to the holdings, as opposed to the dicta" of the U.S.

Supreme Court's decisions. Williams, 529 U.S. at 412. An "unreasonable application" of clearly

established federal law is an "objectively unreasonable" application of law, not merely an

erroneous application. *Eley*, 712 F.3d at 846 (quoting Renico v. Lett, 130 S.Ct. 1855, 1862

(2010)).

The standard under § 2254(d) was intended to be difficult to meet; it embodies a policy

that state court decisions be given the benefit of the doubt. *Cullen v. Pinholster*, 131 S.Ct. 1388,

1398 (2011). The petitioner has the burden of proof. *Id.* Furthermore, review under 28 U.S.C. § 2254(d) is limited to "the record that was before the state court that adjudicated the claim on the merits." *Id.*

A habeas court must apply the standard described in § 2254(d) to the last reasoned state court decision. *Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2009). "Where there has been one reasoned state court judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). Furthermore, when a state court summarily rejects a federal claim, it may be presumed that the decision was on the merits, and deference is given. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). *Cf. Harris v. Reed*, 489 U.S. 255, 265 (1989).

## IV. DISCUSSION

*A.    Ground One: Prosecutorial Misconduct*

In Ground One of the habeas petition, Allen argues that prosecutorial misconduct throughout the trial denied him his federal and state[2] constitutional rights to a fair trial. Allen alleges the prosecutor committed misconduct (1) by excluding African-American jurors on the basis of race during the first jury selection, resulting in a mistrial; (2) by failing to inform the defense in advance of trial that witness Rhonda Whitfield had been involved in a car accident and sustained memory loss; (3) by not notifying the defense in advance that witnesses Ruby Waller and Rhonda Whitfield would make an identification of Allen based on prior drug purchases from him; (4) for making outlandish comments to the jury concerning matters which he had been instructed not to speak about; and (5) cumulatively, denying Allen a fair trial.

---

[2] Federal habeas relief is not available for errors of State law. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Therefore, the Court will address only Allen's claims of federal constitutional violations.

Federal habeas review is limited to determining whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). In making this determination, courts must examine the entire proceedings of the case. *Id.* Courts must consider the prosecutor's conduct, the effect of curative instructions, and the strength of the evidence. *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001)(citing *Darden v. Wainwright*, 477 U.S. 168, 183 (1986); *Donnelly*, 416 U.S. at 643.)

> 1.    *Excluding African American jurors on the basis of race during the first jury selection*

Allen was granted a mistrial when the prosecutor made race-based peremptory challenges empaneling the first jury. This, he says, was the beginning of a pattern of misconduct by the prosecutor. On direct appeal, Allen argued that the mistrial showed the prosecutor's malicious intent and willingness to use any means to get a conviction. *Allen I*, 337 N.J. Super. at 268.

The Appellate Division, although citing state case law, applied the well established federal standard for prosecutorial misconduct: whether it was so egregious that it deprived defendant of a fair trial. *Id.* (citing *State v. Frost*, 158 N.J. 76, 83 (1999)). The Appellate Division reasonably applied controlling Supreme Court law in concluding Allen was not deprived of a fair trial because the jury selection process was terminated after the misconduct and a new jury was empaneled. *Id.* There is no basis for habeas relief on this claim.

> 2.    *Failing to inform the defense in advance of trial that witness Rhonda Whitfield had been involved in a car accident and sustained memory loss*

During the trial, the defense learned that one of the State's witnesses, Rhonda Whitfield, had been in a car accident and suffered head trauma that may have affected her memory. When

the trial court learned that the State had not provided this information to the defense in advance of trial, it offered the defense the option of a mistrial. Defense counsel declined the mistrial.

After the jury was charged, the prosecutor introduced, outside the presence of the jury, the testimony of an investigator who testified that Whitfield had never told the prosecution she was in an accident that resulted in memory loss. *Id.* at 270. *Allen I*, 337 N.J. Super. at 269-70. Whether the prosecution's lapse was purposeful or not, however, the information was turned over in time to be used effectively. The information concerning Whitfield's accident and injuries was well developed before the jury, particularly by the defense in an effort to discredit her testimony. *Id.* Finally, the trial court offered defendant a mistrial, and he waived the issue by declining the offer. *Id.* Therefore, the Appellate Division concluded, any discovery violation did not deprive defendant of a fair trial or undermine confidence in the outcome of trial. *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 675-76 (1985)).

The Appellate Division applied the correct Supreme Court precedent for a claim of prosecutorial misconduct based on a *Brady* violation. *See Bagley*, 473 U.S. at 675 ("The *Brady* rule is based on the requirement of due process . . . 'unless the omission [in discovery] deprived Allen of a fair trial, there was no constitutional violation requiring that the verdict be set aside'" (quoting *U.S. v. Agurs*, 427 U.S. 97, 108 (1976)). The record shows the defense declined a mistrial and instead used the information to attack Whitfield's credibility. Therefore, the Appellate Division reasonably concluded that Allen, although he now regrets forgoing a mistrial, was not deprived of a fair trial. Allen is not entitled to habeas relief on this claim.

3.   *Failure to notify the defense in advance that witnesses would identify Allen based on prior drug purchases*

Allen contends that the prosecutor failed to provide him with discovery material that two witnesses, Waller and Whitfield, were prepared to make prior identifications of him based on

drug purchases they made from him at the Mack house. The trial court rectified any discovery violation, however, by having the prosecutor provide Allen with the material prior to trial. In reply, Allen contends his counsel was greatly hampered by the *Brady* violations, and that he would have been more effective had he received the disclosures sooner.

In addressing this claim, the Appellate Division noted that Waller's and Whitfield's statements were turned over to the defense, if not timely, at least prior to trial. *Allen I*, 337 N.J. Super. at 269. Additionally, the trial judge carefully instructed Waller and Whitfield not to testify that they had purchased drugs from Allen. *Id.* Therefore, the Appellate Division, applying controlling Supreme Court precedent, concluded that "any discovery violation or failure to produce evidence relevant to the witnesses' credibility" did not deprive Allen of a fair trial or undermine confidence in the outcome of trial. *Id.*

The Appellate Division reasonably applied controlling precedent in denying this claim because the defense had an opportunity to prepare for the identification issue before trial. Allen has not described how defense counsel could have prepared any differently if he had known about Waller and Whitlock's prior identifications sooner. Therefore, Allen is not entitled to habeas relief on this basis. The related issue of Waller and Whitlock's noncompliance with the judge's *in limine* order is dealt with in the following section and in Section IV(C).

> (4)    *The Prosecutor's "outlandish" comments to the jury about matters which he had been instructed not to speak about, and Whitfield and Waller's disobedience of the* in limine *order to remain silent about prior drug transactions.*

Nowhere in the petition does Allen describe the alleged "outlandish comments" the prosecutor made to the jury that he had been instructed not to speak about. *See Petition* (Dkt. No. 1 at 6, ¶5 "It seems the prosecutor made the outlandish comments following the *Brady* incident because he felt that the defense would not tactically move for a mistrial.") On direct appeal,

Allen argued generally that the prosecutor made comments in his opening and closing statements that were unsupported by evidence, and that he had been instructed not to speak about. (Dkt. No. 37-2 at 18.) Nowhere in the appellate brief or in his reply brief on direct appeal (Dkt. No. 37-4), however, did Allen identify a single such improper comment. (*Id.*) Not surprisingly, then, the Appellate Division did not address the propriety of any specific comments made by the prosecutor in opening or closing statements.

The Appellate Division did, however, address the fact that Whitfield and Waller testified to matters they had been instructed by the trial court not to bring up. *Allen I*, 337 N.J. Super. at 269. Allen argued that the prosecutor intentionally elicited statements from Whitfield and Waller that they had purchased narcotics from Allen in the past or that he may have had a violent history. *Id.* The Appellate Division found nothing in the record to support a claim that the prosecutor knew Waller and Whitlock were going to make those statements or that the prosecutor encouraged them to disregard the judge's instructions. *Id.* When the witnesses made the improper comments, the judge struck them and instructed the jury to disregard them. *Id.* Thus, the Appellate Division found this did not constitute prosecutorial misconduct.

The Appellate Division cited the standard for prosecutorial misconduct described in *State v. Frost*, 158 N.J. 76, 83 (1999). In New Jersey, prosecutorial misconduct can be a ground for reversal if the prosecutor's misconduct was so egregious that it deprived Allen of a fair trial. *Id.* at 83. "Specifically, an appellate court must consider (1) whether defense counsel made a timely and proper objections to the improper remarks; (2) whether the remarks were promptly withdrawn; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." *Id.* This is consistent with controlling Supreme Court precedent. *See Moore*, 255 F.3d at 107 (citing *Darden*, 477 U.S. at 183; *Donnelly*, 416 U.S. at 643.)

Thus, in denying relief, the Appellate Division applied the correct standard under controlling Supreme Court precedent. The court reasonably denied the prosecutorial misconduct claim because the prosecutor did not encourage the improper testimony, which was struck from the record, and the judge gave curative instructions to the jury. *Allen I*, at 269. A jury is presumed to follow curative instructions, a presumption that can be overcome only by an "overwhelming probability" that it was unable to do so, *Richardson v. Marsh*, 481 U.S. 200, 208 (1987), and a strong likelihood that the effect was "devastating" to the defendant, *Bruton v. United States*, 391 U.S. 123, 136 (1968). *See also Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987). No such showing was made; the instruction was swift and sure, and the witnesses' statements did not introduce the subject of drug dealing where it had been absent before.

In the context of the entire trial, where Allen was seen coming out a known drug house after the victim's failed attempt to purchase drugs, it was not unduly prejudicial for Waller to testify she bought drugs from Allen. Furthermore, given the context of the crime, it was not unduly prejudicial for Whitlock to testify she thought a beating was going to occur. Drug transactions are commonly known to carry a risk of violence if something goes wrong, and a verbal argument was already underway. The Appellate Division reasonably concluded that Allen was not denied a fair trial on the basis of Waller's and Whitfield's improper testimony. Allen is not entitled to habeas relief on this claim.

5.   *Cumulative effect of the prosecutor's misconduct*

Allen contends that the cumulative effect of the prosecutor's acts of misconduct prejudiced the outcome of his trial. In particular, he claims that defense counsel was greatly hampered by the *Brady* violations and, with timely disclosure, would have litigated more effectively "when it came to issues relating to the State witnesses['] trial testimony." (Dkt. No.

40 at 6.) This Court will apply the general standard for prosecutorial misconduct: whether, in light of the proceedings as a whole, the misconduct as a whole so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Darden*, 477 U.S. at 181.

The Appellate Division stated that "our careful review of the record leads us to conclude that the trial issues raised by defendant are clearly without merit and warrant only the following discussion." *Allen I*, at 264 citing R. 2:11-3(e)(2))." Thus, although it dealt with some of the contentions individually, its rejection of this cumulative error claim was summary.[3]

When a state court summarily rejects a federal claim, a federal habeas court may presume the claim was decided on the merits. Such a decision is entitled to deference. *Harrington*, 562 U.S. at 784-85. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

> Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

*Id.* at 102.

The alleged instances of prosecutorial misconduct resulted in little if any prejudice to the defense. The race-based peremptory challenges were entirely rectified by the empanelment of a

---

[3] New Jersey R. 2:11-3(e)(2) provides:

> Criminal, Quasi-Criminal and Juvenile Appeals. When in an appeal in a criminal, quasi-criminal or juvenile matter, the Appellate Division determines that some or all of the arguments made are without sufficient merit to warrant discussion in a written opinion, the court may affirm by specifying such arguments and quoting this rule and paragraph.

new jury. Although Waller's and Whitlock's prior identifications were not disclosed timely, they were disclosed before trial. The trial judge instructed the witnesses that they could not testify they had purchased drugs from Allen in the past, an order that they disobeyed. The Appellate Division found the prosecutor was not at fault for Waller's and Whitlock's blurting out of certain statements the judge had barred. *Allen I*, at 269. The testimony was struck, however, and a curative instruction was given. *Id.* As discussed above, it is not very likely, in the context of a murder committed after a failed drug purchase at a known drug house, that the jury would have been inclined to convict Allen because they heard he made a drug sale in the past or that Whitlock feared another beating was about to take place. As to the belated disclosure of Whitlock's head trauma, Allen was offered a mistrial and declined. Instead, he used the head trauma to attack Whitlock's credibility. He cannot now argue that the discovery violation contributed to the cumulative effect of denying him a fair trial.

I, like the state courts, have considered these contentions individually and cumulatively. Based on the record as a whole, this Court concludes that, at best, fairminded jurists could disagree on whether the Appellate Division correctly denied Allen's cumulative prosecutorial misconduct claim. It did not misapply federal law. Allen is not entitled to habeas relief on this claim.

**B.**    *Ground Two: Denial of Motion for Judgment of Acquittal*

In Ground Two, Allen argues that the trial court erred in denying his motion for judgment of acquittal because no reasonable jury could have convicted beyond a reasonable doubt based on the admissible evidence. Allen stresses that not a single witness saw Allen shoot the victim. He argues that the witnesses, who placed Allen at the scene minutes before the shooting, were under the influence of controlled substances, and that their testimony conflicted in certain areas.

The State did not produce a murder weapon, bullet casings, fingerprints or other physical evidence linking Allen to the shooting. Furthermore, Allen contends, Whitfield perjured herself when she testified she could remember the shooting incident despite her head trauma in a car accident.

Respondents respond that the testimony of the State's main witnesses, Ruby Waller and Rhonda Whitfield, was sufficient to support Allen's convictions. Although they were under the influence of drugs on the day in question, the jury was aware of that fact, and their credibility and reliability was therefore a question for the jury; neither a state nor a federal court can usurp that fact finding role.

The standard for sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*. 442 U.S. 307, 319 (1979) That standard gives due regard to the fact-finder's ability to view the evidence, resolve conflicts, and draw reasonable inferences from the evidence. *Id.* A habeas court must presume that the jury resolved conflicts in favor of the prosecution, and defer to that finding. *Id.* at 326. The inquiry is not "whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). "[A] state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the "decision was 'objectively unreasonable.'" *Parker v. Matthews*, 132 S.Ct. 2148, 2152 (2012)(quoting *Cavazos v. Smith*, 132 S.Ct. 2, 4 (2011)). The net result in a "twice-deferential" standard of review. *Id.*

The Appellate Division applied the correct standard. It was sufficient, it held, that the State "presented witnesses who saw defendant at the scene arguing with the victim, at least one

16

of whom saw him with a weapon, and another who heard what sounded like gunshots s...." *Allen I*, 337 N.J. Super. at 270-71. Allen came out of the house with a weapon, saying he had something for this [person], and profanely expressed anger toward the victim. The shooting followed immediately. Giving the State the benefit of all reasonable inferences which could be drawn therefrom, a reasonable jury could find that Allen shot the victim. *Id.* at 271.

Notwithstanding Allen's objections, neither direct eyewitness testimony of the shooting nor recovery of the murder weapon is required to sustain a conviction. *See Government of Virgin Islands v. Harris*, 938 F.2d 401, 419 (murder and possession of a weapon convictions can be sustained on circumstantial evidence). Nor is it the role of the courts to "usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury.'" *U.S. v. Wise*, 515 F.3d 207, 214 (3d Cir. 2008)(quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)).

While the jury might have discounted Waller's and Whitlock's testimony because they were using drugs, they also were privileged to credit that testimony. The jury was aware of the witnesses' drug use, and also of Whitlock's head trauma. Having weighed those factors, they obviously nevertheless found the testimony credible.

At trial, defense counsel strenuously pressed the reasons now pressed by Allen for rejecting the witnesses' testimony. (*See* Dkt. No. 37-50, 7T11-14 to 11-19; 7T13-5 to 13-8; 7T15-6 to 15-10; 7T16-6 to 16-13). The jury was not persuaded. The Appellate Division reasonably concluded that, based on the testimony of two witnesses, a rational trier of fact could conclude that Allen shot the victim, causing his death. From Waller and Whitlock's interlocking accounts a reasonable jury could reasonably infer that Allen shot and killed the victim. Therefore, Allen is not entitled to habeas relief on Ground Two of the petition.

C.      *Ground Three: Denial of Mistrial*

Allen contends that he was denied his right to due process when the trial court failed to grant a mistrial. (Dkt. No. 1 at 10.) The prosecution had been instructed that Waller could testify that she knew Allen, but could not reveal that she knew Allen because she had purchased drugs from him in the past. Nevertheless, when the prosecutor asked Waller if she was an acquaintance of Allen, she responded "just to purchase drugs." The trial court struck the comment and gave a curative instruction, but denied Allen's motion for a mistrial. Whitfield testified that she walked away from the Mack House when Allen was arguing with the victim because she thought "it was another beating up like they always do." The trial court sustained the defense's objection. Whitfield, however, repeated the comment. The court denied the motion for a mistrial "at this point in time" but later offered the defense the option of a mistrial, which was declined.

"If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him due process of law guaranteed by the Fourteenth Amendment," he must meet a high standard. The issue is not merely, as it would be at trial, whether the prejudicial effect of the evidence outweighed its probative value. Rather, on habeas, the petitioner must show that the evidence was so inflammatory as to prevent a fair trial. *See Duncan v. Henry*, 513 U.S. 364, 366 (discussing difference between error of state evidentiary law and violation of due process clause of Fourteenth Amendment).

The Appellate Division considered this testimony from Waller and Whitlock in the context of a claim of prosecutorial misconduct. It concluded that Allen was not unduly prejudiced by the testimony. *Allen I*, 337 N.J. Super. at 269.

I agree. As discussed in Section IV.A.3., *supra*, it was not unduly prejudicial for the jury to hear that Allen sold drugs to Waller in the past, or that Whitlock anticipated a beating. These

are facts the jury might readily have inferred from the argument between Allen and the victim, following a failed drug sale at a known drug house. Waller testified that she took the victim to the Mack House because he asked where he could buy drugs. Waller had clearly bought drugs from the Mack House before. Allen was seen coming out of the Mack House profanely berating the victim about his attempt to buy drugs. That Waller (or someone else) had bought drugs from Allen in the past required no stretch of the imagination. Similarly, the jury, with or without Whitlock's statement, might easily have inferred that a heated verbal argument over a drug transaction had the potential to turn violent.

Finally, the trial judge gave curative instructions. For the reasons expressed above, the circumstances do not suggest that the jury would have had particular difficulty in following them.

Allen has not shown that the Appellate Division unreasonably applied Supreme Court precedent by concluding that he was not denied a fundamentally fair trial. Thus, Allen is not entitled to relief on Ground Three of the habeas petition.

D.   *Grounds Four, Nine, Ten, Eleven, Twelve, Fourteen, and Fifteen:*
     *Ineffective Assistance of Trial Counsel*

Allen alleges multiple violations of his Sixth Amendment right to effective assistance of counsel. In Ground Four, Allen alleges four relevant instances: (A) failing to accept a mistrial (when Whitfield repeated her improper testimony about a beating);[4] (B) failing to investigate and call John Korman as a witness; (C) failing to request a mistrial for the *Brady* violation (Whitfield's head trauma); (D) failing to call an expert witness. Grounds Nine, Eleven, Twelve, Fourteen and Fifteen are variations on these claims.

---

[4]      Trial Transcript, Dkt. No. 37-44 at 50, 52.

The controlling Supreme Court precedent for a Sixth Amendment claim of ineffective assistance of counsel is *Strickland v. Washington*, 474 U.S. 668 (1984). To succeed, a defendant must first show that counsel's performance "fell below an objective standard of reasonableness." *Id.* (quoting *Strickland* at 688.) "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (citing *Bell v. Cone*, 535 U.S. 685, 702 (2002); *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986); *Strickland*, 466 U.S. at 689; *United States v. Cronic*, 466 U.S. 648, 656 (1984)).

*Strickland* requires a second showing, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is one 'sufficient to undermine confidence in the outcome.'" *Id.* The "ultimate focus" of the prejudice inquiry is on the fundamental fairness of the proceeding. *Id.* at 696. "Prejudice is viewed in light of the totality of the evidence at trial and the testimony at the collateral review hearing." *Collins v. Sec. of Pennsylvania Dep't of Corr.*, 742 F.3d 528, 547 (3d Cir. 2014)(citing *Rolan v. Vaugh*, 445 F.3d 671, 682 (3d. Cir. 2006)). A court need not address both components of the ineffective assistance inquiry. *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.*

1.      *Grounds Four(A), Seven, Ten, Twelve, Fourteen and Fifteen: Counsel's rejection of a mistrial based on Whitfield's improper comment*

Allen's first ineffective assistance of trial counsel claim, raised in Grounds Four(A), Seven, Ten, Twelve, and Fourteen, is that trial counsel erred by failing to accept the Court's offer of a mistrial after the second time Whitfield she believed a beating was about to take place.

Based on the record at trial, the Appellate Division found the following:

The judge reminded counsel that he was prepared to declare a mistrial:

> THE JUDGE: I asked you earlier do you want a mistrial. You said no.
>
> TRIAL COUNSEL: Not on this issue.
>
> THE JUDGE: A mistrial is a mistrial, isn't it, one way or the other. Do you want a new jury or not?
>
> Before answering that question[,] why don't you talk to your client on the issue. He's not right here at this point in time. Ask him on that point. I told you earlier I would give you another trial. You can't have it both ways. Either you want a mistrial and another shot to try it before a different jury or you don't. You talk to your client and you tell me what your preference is.

After a recess, trial counsel informed the judge as follows:

> TRIAL COUNSEL: Your Honor, I'm not renewing any applications pursuant to your request. I discussed this again with my client and I have no motions for mistrial.
>
> THE JUDGE: If you made one a few minutes ago[,] you withdraw it. Is that what you're telling me?
>
> TRIAL COUNSEL: Yes, sir.

The Appellate Division considered the following findings by the PCR Court, after an evidentiary hearing, on the issue of defense counsel's decision to decline a mistrial:

> The evidentiary remand hearing was conducted on August 4 through 6, 2008. [Trial counsel] and defendant [] testified. Closing arguments were made on September 3, 2008, at which time the judge carefully reviewed the evidence presented and placed his decision on the record....
>
> [The PCR Judge] summarized the trial testimony given by Ruby Waller. She was the trial witness who testified that she met the

21

victim at 5:30 or 6:00 on the morning of the shooting on West Third Street near Lee Place and that he asked her to help him buy drugs. They both got into the victim's car and drove to West Third Street and Prescott Place. She described at one point seeing defendant with the victim shortly before he was shot.

The judge also described the testimony of Whitfield, who testified that she saw defendant chasing the victim shortly before the shooting. The judge observed that the credibility of both witnesses was vigorously attacked by defense counsel, using their prior criminal convictions, their drug addictions, and discrepancies between their statements to impeach their credibility. The judge expressed that he thought defense counsel "had done a lot of damage to their credibility."

The judge found defense counsel to be a credible witness. He discredited defendant's testimony that the only basis for rejecting the two offers for mistrial was the economics of retrying the case. Instead, the judge found that, although defendant and defense counsel had briefly discussed the economics of a mistrial, counsel credibly testified that he would have retried the case even without additional compensation. The judge concluded from the attorney's testimony that the real reasons for rejecting the offers for mistrial were tactical concerns about whether the State would call both of the impeached witnesses at a mistrial; whether a new prosecutor might be assigned who would be more effective in retrying the case; and counsel's opinion that they had a good shot at an acquittal, given the state of the evidence up to that point. He found that the attorney's reasoning was sound; there was sufficient time to discuss it with defendant; and the decision was a strategic decision that should not be disturbed. He concluded that neither prong of *Strickland* had been satisfied because counsel's performance was not deficient; nothing demonstrated any unprofessional errors; and the result would not have been different had the case been retried.

*Allen III,* at *4-5.

The Appellate Division held:

Here, the judge made specific findings from the testimony of trial counsel and defendant that counsel's performance was not deficient in a number of respects. Those fact-findings have substantial support in the record and will not be disturbed on appeal. Defendant has simply failed to satisfy the first prong of *Strickland.*

22

*Id.* at \*10.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengable." *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (quoting *Strickland*, 466 U.S. at 690). After hearing the testimony of defense counsel, the PCR Court found factually that the real reasons for rejecting the offers for mistrial were as follows: (a) tactical concerns about whether the State would call both of the impeached witnesses at a [second] trial; (b) whether a new prosecutor might be assigned who would be more effective in retrying the case; and (c) counsel's opinion that they had a good shot at an acquittal. In relying on these findings, the Appellate Division reasonably applied *Strickland* in upholding the PCR Court's denial of the ineffective assistance of counsel claim. Therefore, Allen is not entitled to habeas relief on this claim.

2.       *Trial counsel's failure to call Korman as a witness to the shooting*

In Grounds 4(B), Eight, Eleven, Fourteen and Fifteen, Allen alleges ineffective assistance based on trial counsel's failure to call John Korman as a witness to testify that Allen was not the shooter. In *Allen II,* the Appellate Division remanded that claim to the PCR Court for an evidentiary hearing, summarizing the issue as follows:

> [W]hether Korman's present statement warrants a new trial under the standard applicable to motions for newly discovered evidence. In judging that issue, we do not preclude development of anything Korman said on prior occasions, especially to defendant's counsel, the prosecutor or others while the trial was in process, regarding being called to testify and for an assessment of credibility based thereon.

On remand, the PCR Court held an evidentiary hearing and rejected the claim. On review of that ruling, the Appellate Division adopted and summarized the following findings of fact.

> The evidentiary remand hearing was conducted on August 4 through 6, 2008. Knight; Korman; Charles Miller, the Public

Defender's investigator who interviewed Korman; trial counsel; and defendant all testified. Closing arguments were made on September 3, 2008, at which time the judge carefully reviewed the evidence presented and placed his decision on the record.

. . .

With respect to Korman's testimony, the judge compared Korman's testimony to that of Knight. He found that Knight had "no ox to gore" and that Knight did not lie. He further credited the testimony of Knight that "he makes a practice of telling people who are potential witnesses in PCRs they're not to discuss or read anything about the case, that indeed he does that on a regular basis." He further found that when Knight and Korman first met, [Korman] had in his possession a file on defendant's case with access to published and unpublished opinions by the Appellate Division. He found that Knight did not provide any of those materials to Korman. Thus, he found that the only logical conclusion was that defendant gave those materials to Korman. He found the whole of Knight's testimony credible and found that it was not exaggerated or fabricated in any way.

The judge then reviewed Korman's extensive criminal history, including his conviction for two separate murders for which he was then serving time. He noted that if Korman's testimony was true, defendant would be entitled to a new trial because it would be newly discovered evidence. However, he found that Korman did not see the shooting, contrary to his testimony. He found that the version given by Korman at the PCR hearing was different from the affidavit he gave to Knight and, of course, different from his earlier total denial of being at the scene at all.

The judge found that not only did Korman have the documents just described in his file, but he also had a document that basically outlined how to lie on the affidavit and take the weight for the murder, "an outline in which he researched immunity and [h]ow he thought that if he gave it in a very careful way, the statement, taking the weight for the murder, it cannot be used against him." He also noted that Korman claimed to have post-traumatic stress disorder from his service in Vietnam, which gave him short-term memory problems that were the basis of a claim for diminished capacity in his own pending PCR application. The judge characterized this as making Korman a "[p]retty shrewd guy. Pretty shrewd liar."

He also found that at the time of the murder, Korman was on prescription medication, and he consumed a pint of brandy, a dozen twelve-ounce cans of Budweiser, and five to seven vials of crack cocaine each and every day. "To say he has problems with his credibility is begging the issue." He noted that Korman admitted lying on various previous occasions, including to the Plainfield police at the time of the homicide. He also lied to Detective Egan during an interview with him and lied in the PCR hearing before the judge repeatedly.

I've seen Mr. [K]orman. I've seen a lot of people testify before me. I looked at his ability to testify. I looked at his body language. He's a liar. In the eyes ... of the [c]ourt, Mr. [K]orman is an unreliable person who has lied multiple times and lied in court.

He lied when he said that he saw an unknown, unidentified person murder the victim. He lied when he said it wasn't [defendant Allen]. Now the test for a recanting testimony is the following: the test ... for the [j]udge to evaluate a recantation upon motion for a new trial is whether it casts serious doubt about the truth of the testimony given at the trial and whether if believable the factual recital or recantation so seriously impugns the entire trial evidence as to give rise to a conclusion that the result is a possible miscarriage of justice.

The judge found that the testimony was not believable-that it was a fabrication and a lie. He found that Korman was unworthy of belief. He also found that counsel was not ineffective in failing to interview Korman because Korman was under indictment for two murders at the time of defendant's trial and defendant had not shown that Korman's counsel would have allowed him to give a statement. Additionally, Korman himself at the time of defendant's trial was denying any knowledge of the crime and denying that he was a witness. As a consequence, he denied the PCR motion. This appeal followed.

*Allen III,* at *4-6.

The Appellate Division held:

We have carefully reviewed the whole of the testimony offered by each witness at the PCR hearing. We concur unequivocally with the judge's fact-findings that defendant and Korman were not credible. Korman in particular was impeached by the prosecutor ad nauseam. His complete and utter lack of credibility exudes from

the cold record itself. Defendant's testimony too lacked credibility
and was also at odds with the testimony given by his trial counsel.

. . .

In order to justify a new trial, the judge must find that the evidence
would likely change the result of the case if a new trial is granted.
*DEG, LLC v. Twp. of Fairfield*, 198 N.J. 242, 264 (2009); *Quick
Chek Food Stores v. Twp. of Springfield*, 83 N.J. 438, 445 (1980).
Because the testimony of Korman was not credible, it cannot be
said that his testimony would likely change the outcome of the
case if a new trial was granted.

*Id.* at *9.

The PCR Court reasoned that counsel was not ineffective because Korman was under
indictment for two murders at the time of defendant's trial and defendant had not shown that
Korman's counsel would have allowed him to give a statement. Furthermore, at the time of
defendant's trial, Korman denied being a witness to the crime or having any knowledge about it.
In short, counsel's failure to call Korman was understandable, and not ineffective.

In affirming the PCR Court, the Appellate Division applied the prejudice prong of the
*Strickland* standard and held that Korman's testimony would not have changed the outcome of
the trial because it was not credible. That was a reasonable application of *Strickland*.

In Ground Eight, Allen separately argues that he should be granted an evidentiary hearing
in this Court, to determine the effect of the newly discovered evidence of John Korman's
affidavit. Respondents assert Allen is not entitled to an evidentiary hearing because the State
Court held an evidentiary hearing and properly denied relief. Allen replies that there may be a
need to expand the record.

28 U.S.C. § 2254(e)(2) provides:

(2) If the applicant has failed to develop the factual basis of a claim
in State court proceedings, the court shall not hold an evidentiary
hearing on the claim unless the applicant shows that--

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

Allen has made no showing under § 2254(e)(2)(a) regarding additional evidence he needs to develop on the issue of John Korman's affidavit. Therefore, review under 28 U.S.C. § 2254(d)(1) is limited to the record that was before the state court when it adjudicated the merits of Allen's claim. Cullen v. Pinholster, 563 U.S. 170, 181 (2011). Ground Eight of the petition, a request for a federal evidentiary hearing, will be denied.

In Ground Eleven, Allen raises the related claim that the PCR Court misapplied the applicable legal standard for newly discovered evidence. The Appellate Division relied on state law in remanding for a hearing and describing the standard to obtain a new trial on the grounds of newly discovered evidence. *Allen II*, 398 N.J. Super. at 641 (quoting *State v. Carter*, 85 N.J. 300, 314 (1981)); *State v. Johnson*, 34 N.J. 212, 223 (1961). The claimed error is one of state law, not reviewable by a federal habeas court. *See Estelle v. McGuire,* 502 U.S. 62, 67 ("federal habeas corpus relief does not lie for errors of state law) (quoting *Lewis v. Jeffers,* 497 U.S. 764, 780 (1990)). The Court will deny Ground Eleven of the petition because it does not raise a cognizable federal claim.

In Ground Fifteen, Allen alleges that the PCR Court's decision that defense counsel was credible and Korman was not credible lacked support in the record. (Dkt. No. 1 at 45.) Allen contends that the State offered nothing to refute Korman's affidavit, and there is nothing in the

record to show that Korman fabricated the affidavit. His affidavit, moreover, is allegedly consistent with Cynthia Harrison's testimony. (*Id.* at 48.)

The Appellate Division, citing the PCR Court's findings, unequivocally found that Korman was not credible, based in part on his personal history and demeanor. Furthermore, there was substantial circumstantial evidence, summarized above, to support a finding that Korman fabricated his affidavit after discussing it with Allen and doing his own legal research. None of Allen's assertions constitute clear and convincing evidence that any of the Appellate Division's factual findings were unreasonable. *See* 28 U.S.C. § 2254(e)(1) (creating rebuttable presumption that state court findings of fact are correct). Therefore, the Court will deny Ground Fifteen of the petition.

### 3.    *Ground 4(C): Trial counsel's declination of mistrial based on Brady violation*

In Ground 4(C) Allen contends that his trial counsel should have requested a mistrial when Whitfield revealed that she suffered a head trauma in September 1998. Defense counsel raised the issue of a *Brady* because the prosecutor had not revealed that information. After learning the witness had been hospitalized for three weeks, the trial court offered the defense the option of a mistrial.

The Appellate Division, on review of the PCR Court's denial of this claim, found that Allen failed to satisfy the first prong of the *Strickland* test. *Allen III*, 2011 WL 677252, at *10. The Appellate Division made the following findings of fact:

> On the second day of trial, the judge ruled that the prosecutor had violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed.2d 215 (1963), by failing to inform defendant that one of the witnesses at trial, Rhonda Whitfield, had suffered multiple head traumas in a car accident, including concussions that affected her memory.

The judge offered to declare a mistrial, which he thought defendant might decline for economic reasons, but suggested that counsel confer with defendant. The following colloquy occurred after a recess:

> TRIAL COUNSEL: Judge, knowing that, based on my experience, believing that your Honor would actually seriously entertain that, we discussed for 15 or 20 minutes and from a tactical-economics has nothing to do with it. I'm not going to disclose the tactical reasons. I feel that the State might not call this witness again. And the State, I also feel the State might handle this case a little more efficiently and effectively next time. I discussed this with [defendant]. I will not disclose tactical reasons, but I'll be quite clear, economics has nothing to do with it. If I thought it was in my client's best interest, I'd ask for a mistrial right now and start again next week.
>
> THE JUDGE: You concur no mistrial be requested, right or wrong?
>
> DEFENDANT: Yes.
>
> THE JUDGE: I don't know about the discussions back and forth with your lawyer, but has he discussed these issues he talked to me about with you?
>
> DEFENDANT: Yes.
>
> THE JUDGE: You agree with the decision to go forward?
>
> DEFENDANT: Yes.

In addressing Allen's appeal, the Appellate Division correctly cited the *Strickland* standard for ineffective assistance of counsel. *Allen III*, 2011 WL 677252, at *9. Then, the court held:

> Here, the judge made specific findings from the testimony of trial counsel and defendant that counsel's performance was not deficient

> in a number of respects. Those fact-findings have substantial support in the record and will not be disturbed on appeal. Defendant has simply failed to satisfy the first prong of *Strickland.*

*Id.* at *10.

The record supports the PCR Court's finding, affirmed by the Appellate Division, that counsel made a tactical decision in not accepting a mistrial based on *Brady.* Counsel thought the prosecution might present the case more effectively at the next trial. Counsel instead chose to attack Whitfield's credibility, on grounds including the head injury, and hope for an acquittal. Hindsight regret over a strategic decision will not support a claim of ineffective assistance of counsel. *See Marshall v. Hendricks*, 307 F.3d 36, 85 (3d Cir. 2002)("it is critical that courts be 'highly deferential' to counsel's reasonable strategic decisions and guard against the temptation to engage in hindsight." (quoting *Strickland*, 466 U.S. at 689–90.) Therefore, the Appellate Division reasonably applied the *Strickland* standard in denying Allen's claim. This Court will deny this claim.

   4.   *Grounds 4(D) and Nine: Trial counsel's failure to call an expert witness*

Allen's next faults his trial counsel for failing to call an expert witness to testify about the effect of cocaine on a witness's ability to perceive. Such expert testimony, he contends, would have tipped the scale in favor of a not guilty verdict. In his reply, Allen adds that Waller lied when she said crack cocaine did not affect her ability to perceive the events surrounding the shooting. (Dkt. No. 40 at 27.)

The PCR Court denied this claim on Allen's first petition for post-conviction review, and the Appellate Division affirmed, finding that the issue did not warrant discussion in a written opinion. *Allen II*, 398 N.J.Super at 259. On habeas review, the court reviews the last reasoned state court judgment, in this case, that of the PCR Court. *See Ylst v. Nunnemaker*, 501 U.S. 797,

803 (1991)("creating presumption that [w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.")

The PCR Court stated:

> Now, on the issue of the need for an expert to talk to the jury about effects, in this case drugs, I tried maybe 20 homicide cases, I never heard of that. I had experts come in to talk about the effects of drugs and alcohol on a defendant who perhaps made a confession, but I never heard – no harm in asking, of course, but I never heard it at all.
>
> Is this beyond the ken of the jury, I don't think it is. In this day and age with drugs rampant in our society, surely they know drugs are no good for you. They surely know it affects your ability to think. And indeed, the ladies in this testimony were clear about the problems they had.
>
> . . .
>
> Juries are not stupid. They know common things. They know alcohol, they know drugs. They may not know what LSD does to the brain. They may not know when a doctors says what happens when you have eight sips of alcohol or eight martinis, but they weren't asked to do that. All they were asked to think about, do you think in your mind credibility was affected.
>
> . . .
>
> So I am of the opinion, A, there's no requirement in the law or the fact that an expert had to be used at this date and time and lack of an expert as to the drugs at this date and time did not deny your client of any fair trial, did not come into the competence of [defense counsel.] I don't think any competent trial lawyer would have done that. I have been trying cases for 17 years and never seen that here.

(Dkt. No. 37-54 at 35-37.)

Allen has not presented any controlling Supreme Court precedent to establish the PCR Court unreasonably applied *Strickland* here. Counsel need not obtain an expert to testify to

information that is commonly known. *See U.S. v. Perez*, 280 F.3d 318, 341 (3d Cir. 2002) ("the purpose of expert testimony is to assist the trier of facts to understand, evaluate, and decide complex evidential material" (citing *United States v. R.J. Reynolds Tobacco Co.*, 416 F. Supp. 313 (D.N.J. 1976)). It is true that the average juror probably is not familiar with the biochemical mechanisms and physiology of cocaine use; it is just as true, however, that the average juror knows that cocaine affects a person's ability to perceive and reason. Defense counsel cross-examined the witnesses on that basis, and argued to the jury that Waller's and Whitlock's testimony was not credible because they were high on drugs at the time they observed the shooting incident. (Dkt. No. 37-50 at 11, 15, 16.) Prejudice, then, is unlikely.

For these reasons, Allen is not entitled to habeas relief on this claim.

**E.**    *Ground Five: Ineffective Assistance of Appellate Counsel*

In Ground Five, Allen claims he was denied effective assistance of counsel on appeal, as guaranteed by the Sixth Amendment. Appellate counsel, he says, inexcusably failed to raise the following issues:

> (1) Defendant was denied his right to due process of law and his right to a fair trial when the trial court denied his motion for a mistrial; (2) that defendant was denied effective assistance of trial counsel when (a) trial counsel failed to accept a mistrial after the court had conceded to granting defendants request for a mistrial after numerous prejudicial events had transpired at trial; (b) trial counsel failed to call a witness, Mr. John Korman, who would have testified that defendant was not the person he saw shoot Mr. Lannie Silver; (c) trial counsel failed to request a mistrial for the Brady violation; (d) trial counsel failed to call an expert witness to testify to the [e]ffects cocaine can have on a person[']s perception; (3) The jury general verdict of murder must be vacated because one of the predicates for conviction (knowingly causing serious bodily injury, which resulted in death) is indistinguishable from the conduct proscribed by the Statute defining aggravated and reckless manslaughter. A careful review of the record, diligence preparation and solid communication with defendant, appellate counsel would

have discovered these facts and launched a meaningful and plenary
appeal on defendants['] behalf.

(Dkt. No. 1 at 26.)

The PCR Court addressed the underlying claims, and found they lacked merit. (Dkt. No. 37-54 at 31-38.) The Appellate Division, without discussion, denied Allen's related contention that appellate counsel was ineffective for failing to raise the same claims on direct appeal. *Allen II*, 398 N.J. Super. at 259.

"A first appeal as of right . . . is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney." *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). That standard does not require that every possible claim be pursued. "[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 286 (2000).

The *Strickland* standard applies to claims of ineffective assistance of appellate counsel. *Id.* Thus, the Allen must show that counsel was objectively unreasonable, and must show a reasonable probability that, but for counsel's unprofessional errors, the result of the appeal would have been different. *Id.* at 285-86.

Here, appellate counsel strategically chose to focus on the issues of prosecutorial misconduct and sufficiency of the evidence. (Dkt. No. 37-2.) Allen's other underlying claims—trial counsel's failure to accept a mistrial, failure to call John Korman as a witness, failure to call an expert witness, or failure to raise the issue of ambiguous jury instructions on murder—would not have succeeded, as discussed in Sections IV.A.1-4 and IV.F of this Opinion. Allen therefore cannot cannot that he was prejudiced by appellate counsel's failure to raise them again on appeal. Therefore, the Court will deny Ground Five of the habeas petition.

F.    *Ground Six: Predicate for Conviction of Murder Indistinguishable from Conduct Proscribed By Aggravated and Reckless Manslaughter*

Ground Six asserts that the jury's general verdict of murder must be vacated because one of the predicates for conviction (knowingly causing serious bodily injury, which resulted in death) is indistinguishable from the conduct proscribed by the statute defining the lesser included offenses of aggravated and reckless manslaughter. (Dkt. No. 1 at 28.) The jury, he says, was instructed that Allen would be guilty of knowing serious-bodily-injury murder if he was aware that his conduct was practically certain to inflict injury that creates a substantial risk of death. That instruction, in his view, describes conduct indistinguishable from that proscribed by the statutes defining aggravated and reckless manslaughter. These vague and ambiguous instructions, he argues, resulted in a miscarriage of justice.

On February 4, 2008, the Appellate Division summarily denied this claim.[5] *Allen II*, 398 N.J. Super. at 259.[6] "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98.

The effect of an allegedly erroneous jury instruction on a conviction "must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)(citing *Boyd v. United States*, 271 U.S. 104, 107 (1926)). The standard for relief based on a due process violation is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 148.

---

[5] Allen raised the claim before the Appellate Division again after his second PCR proceeding (Point 4(D)). the Appellate Division denied it because it had already been decided in *Allen II*, 398 N.J. Super. at 259, and could not be relitigated, pursuant to New Jersey Rule 3:22-5. *See Allen III*, 2011 WL 677252, at *10.

[6] The PCR Court denied the claim on state law grounds, because the state law cases Allen relied on were not retroactively applicable. (Dkt. No. 37-54 at 37-38.)

Here, the jury charge on the elements of serious-bodily-injury murder and reckless manslaughter consisted of approximately thirty-five paragraphs. (Dkt. No. 37-51 at 32-40.) Pertinent here are the following instructions:

> In Count One, it's alleged that Mr. Yusef Allen, occasionally known as Status, did on October 15[th], '97, in Plainfield, purposely or knowingly either cause the death of Lannie Smith or purposely or knowingly did inflict serious bodily injury upon Lannie Smith that resulted in his death. That's an allegation.
>
> . . .
>
> I'm going to talk first to you about murder. The pertinent part of the statute on murder gives us its elements. A person is guilty of murder if he either, one, purposely causes the death or serious bodily injury resulting in death, or two, knowingly causes death or serious bodily injury resulting in death.
>
> . . .
>
> If, however, you determine that the State has failed to prove any one or any part of these elements, you must find him not guilty of murder, then consider the charges of aggravated manslaughter and reckless manslaughter. **There are what they call lesser included charges. You get to consider these charges if you find the man not guilty of murder.**
>
> . . .
>
> If, however, after consideration of all the evidence you are not convinced about any part thereof or any one of these elements, you must find him not guilty of aggravated manslaughter and consider the charge of reckless manslaughter.

(*Id.* at 32-39 (emphasis added.))

The jury instructions on murder and the lesser included offenses unambiguously state that the jury should consider the charges one at a time, *seriatim*. The jury was instructed first to determine whether the elements of murder were present. Only if it decided to acquit on the murder charge was the jury to consider whether the elements of aggravated manslaughter were

present. Again, only if it decided to acquit on the aggravated manslaughter charge was the jury to consider the reckless manslaughter charge. Given the jury's finding that Allen was guilty of murder, his claim that the lesser included charges were duplicative is immaterial. The jury was not asked to compare crimes and choose among them; it was asked to consider the instructions on murder and determine whether Allen was guilty beyond a reasonable doubt. Only if the jury answered that question in the negative would it have gone on to consider the lesser included offenses. Thus the claimed error, assuming it was an error, had no discernible effect.

Allen has not cited any U.S. Supreme Court case establishing that the Appellate Division unreasonably applied the due process standard regarding jury instructions. Therefore, he is not entitled to relief on Ground Six of the petition.

G.   *Ground Seven: Prosecutor's Heinous Misconduct*

In support of Ground Seven, Allen contends as follows:

> [T]he jury heard evidence from an upstanding student and other witnesses that backed Mr. Allen's assertion of innocence. The jurors were either swayed by an admittedly brain damaged drug addict and another substance abuser or they were improperly swayed by the nonstop barrage of name calling, improper allegations of defendant's alleged association with a notorious crime family, *Brady* violations, last minute discovery and a myriad of other improper acts committed by the Assistant Prosecutor in this case.

(Dkt. No. 1 at 30.) Allen concedes that his counsel raised this claim on direct appeal, but asserts that his appellate attorney "did not lay out the almost nonstop array of misconduct . . ." *Id.*

Allen again raised a version of this claim in his first petition for PCR. The PCR Court denied the claim. (Dkt. No. 37-54 at 35.) Allen appealed. The Appellate Division affirmed the PCR Court without providing reasons, *Allen II*, 398 N.J. Super. at 250, 259. Therefore, this Court reviews the last reasoned state court decision, that of the PCR Court.

The PCR Court stated:

> I read the decision of Judges Stern and Rodriguez and Fall [direct appeal decision]. Page two, they say Allen argues, Point One, "The prosecutor transgressed all limits of propriety throughout the entire trial, denying Allen his Federal and State constitutional rights to a fair trial." . . . They then go into and say, "After careful review of the record leads us to conclude that the trial issues raised by the defense are clearly without merit and warrant only the following discussion."
>
> . . .
>
> So you can't sell today . . . that they didn't look at the record very well, they weren't apprised of the record very well because, quite clearly, the same lawyer specified . . . that the prosecutor transgressed all limits of propriety throughout the entire State trial. That put them on notice.
>
> Quite clearly, they thought – the appellate lawyer thought and submitted to them that Mr. Silver was beyond all concepts of propriety and that he took away your client's Federal and State constitutional rights. That was forefront of their position to the Appellate Division, that was dealt with by Judge Stern, Rodriguez, and also Fall.
>
> Now, Judge Stern, we all know him pretty well . . . he is not one who just skims things. He read, if necessary, every word. Maybe everyone doesn't do that up there, but he does. You know that as best I do. You can't sell me today, Counsel, that because they didn't set forth 29 instances of conduct by counsel here that the Court did a poor job of its review of the record. I don't believe that.
>
> . . .
>
> You can't sell that either that the totality of the record shows that the jury was so overcome by the conduct of the prosecutor that they gave an unjust result and deprived your client of his rights because I was here, and I heard it, and I watched it.
>
> . . .
>
> So I know and I am of the opinion that: A, you haven't shown anything other than what's been raised before as to the issues of [the prosecutor's] conduct; B, this issue was dealt with clearly by

Judge Stern and his colleagues by Point Two, page two of the
opinion . . .

(Dkt. No. 37-54 at 31-35.)

Essentially, the PCR judge found, based on his own observations at trial, as well as the

Appellate Division's decision on direct appeal, that there had been no such heinous misconduct

warranting vacation of the conviction, and that the appellate court had fully considered the

contention before rejecting it. In New Jersey, a PCR Court need not address a claim that was

raised and denied on direct appeal. N.J. R. 3:22-5 ("a prior adjudication upon the merits of any

ground for relief is conclusive . . ."). At any rate, because the contentions had no merit, appellate

counsel's failures, whatever they may have been, resulted in no prejudice.

For the reasons discussed in Section IV.A. above, Allen is not entitled to habeas relief

based on his claim of cumulative prosecutorial misconduct. Therefore, this Court will deny

Ground Seven of the habeas petition as repetitive of Ground One.

H.    *Ground Ten: Ineffective Assistance of Trial, Appellate and PCR Counsel*

In Ground Ten, Allen rehashes his ineffective assistance of counsel claims and his

prosecutorial misconduct claims. Because this Court has addressed and denied these claims in

Sections IV.A., IV.C., IV.D., IV.E., IV.G., and IV.J. of this Opinion, Allen is not entitled to

relief on Ground Ten of the habeas petition.

I.    *Ground Thirteen: PCR Judge's Refusal To Recuse*

In this claim, Allen contends that the PCR judge's refusal to recuse himself denied him

the right to a fair PCR hearing. The issue arises from Allen's presentation of John Korman's

affidavit, offered as newly discovered evidence, on PCR. In the affidavit, Korman stated he

witnessed the shooting, and that Allen was not the shooter. Without holding an evidentiary

hearing, Judge Triarsi found Korman's affidavit was not credible. (Dkt. No. 37-54 at 30-31.) The

Appellate Division reversed and remanded for an evidentiary hearing. Allen contends the PCR judge should then have recused himself, because he had already determined that Korman was a liar, and therefore could not fairly evaluate the evidence.

Respondents note that Judge Triarsi stated he would "listen to the witnesses and make [his] call independent of anything in the record prior to the time." (Dkt. No. 37-1 at 59 (citing 17T48-25 to 49-2)).   The PCR Court's decision, they say, rested on the evidence adduced at the hearing, and nothing indicates that Judge Triarsi failed to remain neutral or impartial.

I take federal recusal standards, which exceed the Constitutional minimum, as a guide to evaluating the parallel state regime. Pursuant to 28 U.S.C. § 455(a), recusal is required where a federal judge's impartiality might be questioned. *Liteky v. United States*, 510 U.S. 540, 542 (1994) Nevertheless, "[i]t has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant." *Id.* at 551. "Judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Id.* at 555. Where the grounds for recusal "occurred in the course of judicial proceedings and neither (1) relied upon knowledge acquired outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible" recusal is unwarranted. *Id.* at 556.

Here, the Appellate Division affirmed the PCR Court's refusal to recuse. *Allen III*, 2011 WL 677252 at *10. The Appellate Division reasoned that Judge Triarsi's prior ruling had been based on a very limited record. *Id.* The judge was not thereby disabled from fairly evaluating Korman's testimony, which was not previously before the court. *Id.* Furthermore, the Appellate Division agreed with Judge Triarsi that Korman's testimony "was not credible even from the cold record before us." *Id.*

In his first decision, Judge Triarsi focused primarily on the long period of time before Korman came forward, and the fact that Allen and Korman were in the same prison at the time Korman produced the affidavit. (Dkt. No. 37-54 at 25-26, 29-31.) There is no indication of some personal or deep-seated and unequivocal antagonism against Allen, or toward Korman, who had not yet appeared before the court. (*Id.* at 19-21; 29-31). Allen fails to meet the habeas standard for relief on his claim that he was denied a fair PCR hearing. The Court will deny Ground Thirteen of the habeas petition.

J.      *Ground Sixteen: Ineffective Assistance of PCR Counsel*

Allen alleges ineffective assistance of PCR Counsel. But for counsel's ineffective assistance, he says, he would have prevailed in the PCR proceedings.

28 U.S.C. § 2254(i) precludes ineffective assistance of counsel during Federal or State collateral post-conviction proceedings as a ground for relief in a § 2254 petition. *See Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012)(while ineffective assistance on initial collateral review proceedings may be grounds for excusing procedural default, it is not the basis for an independent constitutional claim). Therefore, the Court will deny Ground Sixteen of the petition.

K.      *Grounds Seventeen, Eighteen, and Nineteen*

In Grounds 17, 18, and 19, Allen challenges the denial of his motion for a new trial based on newly discovered evidence of Ruby Waller's testimony in the federal *Mack* trial. That testimony, says Allen, contradicted Waller's testimony in Allen's trial. (Dkt. No. 1 at 51-55.) According to Allen, Waller admitted at the Mack trial that she had lied when she testified in Allen's trial that she had seen him with a gun. On federal habeas review, the question of whether a state court erred by refusing to entertain the petitioner's newly discovered evidence is whether that decision "transgresses a principle of fundamental fairness 'rooted in the traditions of our

people.'" *Herrera v. Collins*, 506 U.S. 390, 411 (1993) (quoting *Patterson v. New York*, 432 U.S.

197, 202 (1977).

This issue has been fully aired. Allen first brought these matters to the attention of the

Appellate Division as newly discovered evidence. *Allen III*, 2011 WL 677252, at *10. The

Appellate Division remanded to the PCR Court, stating:

> In the affidavit defendant submitted in support of his pro se motion
> to supplement the record before us, he certified that on November
> 11, 2009, he received some transcripts from the trial of *United
> States v. Mack*, a federal drug prosecution in Newark. The
> transcripts submitted to us were from October 3 and 4, 2001. The
> witness who was testifying was Ruby Waller. Defendant alleged
> that he learned of this trial from a conversation with Aaliyah Mack,
> the niece of several of defendants in the *United States v. Mack*
> case. Mack told defendant that Waller "admitted to lying in the
> trial of Yusef Allen to the jury as well as the judge about what she
> witness[ed] in that case." Allen signed his certification on August
> 12, 2010, in front of a notary republic.
>
> There were also discrepancies respecting the sequence of events on
> the day of the shooting. Defendant urged in Point Nine that
> Waller's recantation constitutes newly discovered evidence
> warranting a new trial.
>
> . . .
>
> We remand the issue to the PCR judge for consideration as a
> motion for a new trial based on newly discovered evidence. The
> judge should consider not only the testimony we have briefly
> described above, but also any of the other testimony identified by
> defendant from the Mack trial, and then determine whether any of
> this testimony is "newly discovered" and would support an order
> for a new trial. The judge shall hear argument on the motion and
> determine whether an evidentiary hearing will assist in resolving
> the issues.

*Id.* at *6-7, 10.

The PCR Court denied Allen's motion for a new trial, finding that the transcripts of the *Mack* trial did not constitute newly discovered evidence.   (Dkt. No. 35-65.)  The PCR Court stated:

> I have re-read, over the weekend, I think for the fifth time now, the entire transcript of the testimony of Ruby Waller, which goes on for 200 pages . . . We're talking only about the issue of the cross-examination regarding Mr. Norton's [Allen's defense counsel] use of an investigator . . . when she [Waller] was asked if she had been asked the question by the investigators . . . if he, Allen, had a gun, and she said, "Answer: I don't recall . . . she did not want to be bothered . . . Answer: I told them I didn't recall seeing anyone with a gun . . . Answer: I don't want to get no more involved. I was fed up, I had just had my door kicked in.
>
> . . .
>
> Now, ultimately, after much pressure, she did, in fact, admit that she did, indeed, tell him she did not see the gun and if she had said something differently, which she had before me, then that – she agreed to the characterization it was "a lie."
>
> What neither of you provided is what I got out of my notes. Detective Mularz testified . . . that he and a lady named June Davidson, and a third party named Sandy Alamdous (phonetic), looked to find Ruby Waller, and they found her on 12/14/98 at New Street, Plainfield, at her mom's house.
>
> . . .
>
> That's my – off my notes of what was testified. The reason I'm putting them in the record is that the jury, in front of me, heard it and knew that those officers or former officers, indeed, were told by this lady that she did not see a gun and that – that's the fact. So they had information. To the extent that the cross-examination in the federal trial made that clearer, that's repetitive.
>
> Now, on the issue of whether or not this is a newly discovered fact, and is it sufficiently important to require a new trial or even require testimony, I don't see what I could gain . . .

(Dkt. No. 37-65 at 16-20.)

The PCR Court, then, first ruled that this ten-year-old transcript was not "newly discovered" evidence, undiscoverable earlier by the exercise of due diligence. The *Mack* trial occurred in September 2001, and Allen had had multiple attorneys and proceedings since then. Therefore, a person exercising due diligence could easily have uncovered the transcript. (*Id.* at 19.)

More fundamentally, these matters were not really new. Detective Mularz testified *in Allen's trial* that Waller answered that she "did not recall" when asked whether Allen had a gun. Defense counsel vigorously cross-examined Waller on that inconsistent statement (which she explained as essentially an effort to avoid getting involved). The jury heard both sides and obviously believed that Waller's testimony at trial, not her pretrial denial of having any memory, was correct. (*Id.* at 19-20.)

The Appellate Division held that "[t]he findings by Judge Triarsi, buttressing his conclusion that there was no newly discovered evidence, are supported by the transcript of the federal trial, and the judge's own recollection as refreshed by his notes. . . . We have no warrant to intervene." *Allen IV*, 2012 WL 1836109, at *3 (internal citations omitted).

The State's application of its newly-discovered-evidence rule did not transgress any Constitutional principle of fundamental fairness. Nor did it conflict with the standard that would apply in federal court.[7] The newly discovered evidence here could have been discovered years earlier, and the evidence was cumulative to testimony heard from Detective Mularz at Allen's trial. The jury heard the conflicting stories Waller had told about what she witnessed, and the

---

[7]        Federal standards, which are similar to the state rules applied here, require (a) the evidence is newly discovered since the trial; (b) diligence on the part of the movant can be inferred; (c) the evidence is cumulative or impeaching; (d) it is material to the issues; and (e) it would probably produce an acquittal. *United States v. Jasin*, 280 F.3d 355, 361 (3d Cir. 2002).

jury credited Waller's testimony that she saw Allen with a gun just before the victim was shot. The Court will deny Grounds Seventeen, Eighteen and Nineteen of the petition.

## V.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the reasons discussed above, Allen has not met this standard, and this Court will not issue a certificate of appealability.

## VI.    CONCLUSION

For the foregoing reasons, Allen's habeas petition will be denied. A certificate of appealability will not issue. An appropriate order will be entered.


Dated: September 6, 2016

KEVIN MCNULTY
United States District Judge

44